UNION PAC. R. CO. v. RUEF et al.

(Circuit Court, D. Nebraska. November 8, 1902.)

No. 36.

**1. INJUNCTION—LABOR STRIKE—ACTS OF VIOLENCE AND INTIMIDATION.**

The action of labor organizations whose members are engaged in a strike, in undertaking to prevent the employer from carrying on its business by preventing other men from entering or remaining in its service by assaulting them or intimidating them by means of picketing, or by threatening them or their families to such an extent that such employés are afraid to go to or from their place of work, is an illegal invasion of both the property rights of the employer and the personal rights of its workmen, which a court of equity will enjoin where there is no adequate remedy at law.

**2. SAME—PROTECTING RIGHT OF CONTRACT.**

The law upholds and will protect the right of freedom of contract between employer and employé; the right of every person or corporation to hire and discharge men at pleasure, subject to liability for damages for breach of contract, and the right of every man to work or to quit work at his pleasure, subject to the same liability, making no distinction between union and nonunion workmen.

**3. SAME—PICKETING.**

Picketing by a labor organization whose members are engaged in a strike, in and of itself, where properly conducted, is lawful; but when accompanied by violence, or any manner of coercion or intimidation, to prevent others from entering or remaining in the service of their employer, it is unlawful.

**4. SAME—EQUITY JURISDICTION—VIOLATION OF CRIMINAL LAW.**

That assaults committed and threats of violence made by strikers may be subject to punishment under the criminal laws does not deprive a court of equity of jurisdiction to enjoin their continuance, when necessary to protect the complainant's property or business from civil injury.

**5. SAME—ACTS OF LABOR UNIONS—LIABILITY OF MEMBERS.**

Where a labor organization whose members are engaged in a strike institutes a system of picketing around the works of the former employer, which results in acts of violence, and the use of threats and abusive language toward those working for such employer, some of such acts being committed by the pickets and others by their sympathizers, the effect of which, as intended, is to intimidate some of those against whom they are directed, and to prevent them from continuing in the employment, all members who participate in the establishment and maintenance of such picket, as well as those who personally participate in the unlawful acts, must be held chargeable with the results which experience has shown almost universally follow the maintenance of such system. Nor can such responsibility be escaped by merely instructing the pickets that they shall not commit any such unlawful acts, where the officers and members know that they are in fact committed, and take no steps to punish the guilty persons, or to discontinue the picketing, or even to exclude such persons from further service as pickets.

**6. SAME—ILLEGAL ACTS—EVIDENCE CONSIDERED.**

Complainant, a railroad company, engaged in carrying interstate commerce and the mails, maintained a machine shop for the repair of its engines, cars, and equipment. A number of workmen, in different branches of service in such shop, including some of defendants, engaged in a strike, and left the employment. The organizations or unions to which the strikers severally belonged, acting in concert, instituted a system of picketing around the shop, and in the vicinity of its entrances, which was maintained for two months, and until the commencement of

¶ 1. See Injunction, vol. 27, Cent. Dig. §§ 174, 175, 177.

the suit to enjoin the same. During that time upwards of 20 assaults were made upon persons working in the shop, in one instance resulting in the death of the person assaulted within a very few minutes. Threats and abusive language accompanied the assaults and were also used toward other workmen. The wives of some workmen were notified that their husbands would be injured if they did not quit work, and threats were made that they had been or would be photographed for future identification. As a consequence several of complainant's employés quit work, and it was compelled to keep and board others on its premises, and to maintain guards to protect its property. Some of the assaults were committed by strikers, others by sympathizers, and others by persons not identified. There was no evidence that any action was taken by either of the unions disapproving of the unlawful acts of its members, but, on the contrary, one striker, shown to have instigated and participated in a number of the assaults, was subsequently placed in charge of the pickets as captain. *Held*, that such facts established an unlawful conspiracy, and entitled complainant to an injunction against such defendants as were members of the unions which instituted and maintained the pickets, and such others as were shown to have participated in any of the unlawful acts of violence or intimidation.

7. SAME—PARTIES NAMED IN DECREE—DISMISSAL AS TO INNOCENT DEFENDANTS.
  A court will not include, in its decree awarding an injunction against unlawful acts of striking employés of complainant and others acting with them, the names of defendants who were not in complainant's employ, and are not shown by the evidence to have participated in, or to have aided, abetted, or counseled, any of the unlawful acts complained of, but as to them the suit will be dismissed, although they will be held chargeable with knowledge of the terms of the injunction and bound by the same.

In Equity. Suit for injunction.

John N. Baldwin and Edson Rich, for complainant.
C. J. Smyth and E. P. Smith, for defendants.

Before MUNGER and McPHERSON, District Judges.

McPHERSON, District Judge. This is a bill in equity brought against the defendants asking that they be enjoined from in any manner interfering with complainant's property, its business, or with its employés. The complainant is a corporation of the state of Utah. The defendants are all citizens of the state of Nebraska, excepting three, one of whom is a citizen of Wyoming, one of Illinois, and one of the state of Ohio. But, these three having entered a general appearance, the court must enter such decree as the pleadings and evidence require. The complainant is engaged in the operation of a railway extending from in Iowa, through Nebraska, with lines extending in or through five other states.

The material allegations of the bill are that at Omaha the complainant for many years has maintained shops for the repair of its engines, cars, and equipment. To keep said shops going, as well as the road, it is now, and for a long time has been, necessary to employ in said shops various classes of employés, such as boiler makers, blacksmiths, machinists, car repairers, car wheelmen, painters, helpers, and others. In June, 1902, or about that date, a large number of the boiler makers, machinists, and blacksmiths, theretofore in the employ of the company at its various shops, went out on what is commonly called a "strike." Thereupon it became necessary to

employ others to take the places of those on a "strike" to do the work in the shops as aforesaid. That the defendants, comprising in part the parties formerly at work in the shops in Omaha, together with others, since going out on said strike, have carried on a system of attack on complainant, and upon the parties at work in the shops, which attacks have been so persistent that the company has been compelled to employ guards at its own expense, endeavoring to protect its property and its employés in the shops. It is also alleged that the defendants, with others, have conspired to intimidate and terrorize those now in the service in the shops, to prevent them from working, and thereby prevent the motive power from being kept in condition to perform sufficient service, and particularly prevent the engines from being repaired, so that the company cannot get its freight, passenger, and mail trains over the road as required for proper and efficient service. And, to intimidate and terrorize the employés, a picket line is established at and near the said shops. Those now in its employment are cursed and reviled, and all manner of indecent language is hurled at them. The wives and children of the present shopmen are subjected to indecent language, and are threatened with bodily harm to those still in the shops at work. The pickets will follow the workmen as they leave the shops, and assault and knock down those now at work. These and other indecencies and brutalities are charged against those now on the strike and confederates towards those who seek to work in the shops, but they need not now be stated more in detail. But it is alleged that many of the employés have been so terrorized that they have quit work, and that the company has not only been put to great, and otherwise unnecessary, expense on account thereof, but that complainant's trains carrying freight and passengers, and particularly trains carrying the United States mails and interstate business, have been impeded and delayed, and its business hampered, damaged, and its service materially interfered with; and it is alleged that these things are to continue, as threatened by defendants and their confederates.

A restraining order as prayed was issued. The case was set down for hearing at an early day, as to whether a temporary injunction should issue. It was then ordered that the evidence should be taken before examiners, the same to be taken in shorthand and then transcribed. All this has been done, and the case fully argued.

The impression seems to prevail among many men, otherwise informed, that the issuance of injunctions is confined to the federal courts, while the state courts do not recognize "government by injunction" as it is termed. There is no other fallacy so generally entertained by a reading people, and occasionally by lawyers. But if all cases similar to this were presented with the high purpose that has been displayed by counsel on both sides in the case at bar we would have but little denunciation of the courts, and hear less about "government by injunction." Although counsel have so nearly agreed as to what the law is, thereby making substantial controverted questions in the case at bar questions of fact, it is incumbent upon us to each state both the law and the facts of the case as we understand them.

And this duty is the more obligatory because counsel have agreed that this hearing shall result in a final decree. The right to the great writ of injunction is precisely the same in the federal court as in the state court. But this court, before it can exercise jurisdiction, must have a case between parties of diverse citizenship, or this court must have a case presenting a "federal question." A federal question is presented in this case, because of the allegations that it is the purpose of defendants to impair the powers of the complainant to serve the public in carrying interstate commerce and in carrying the United States mail. And in both instances the amount involved must be in excess of $2,000. But under the stipulations of the parties, and the undisputed evidence, this court takes jurisdiction on both grounds, and, the jurisdictional amount being involved, the question of how this case should be considered, and how decided, is precisely the same, whether in one court or another.

The following are some of the cases by the federal judges on the circuit in which the writ of injunction has been issued, some in cases of physical violence to employés, some in cases of injury to property, and others were cases of intimidation to and terrorizing of employés, but without actual physical violence, and some of the cases were those of habeas corpus, where the only question was as to the power to have issued the injunction. Toledo, A. A. & N. M. Ry. Co. v. Pennsylvania Co. (C. C.) 54 Fed. 730, 19 L. R. A. 387, by Judge Taft; Cœur D'Alene Consol. & Min. Co. v. Miners' Union of Wardner (C. C.) 51 Fed. 260, 19 L. R. A. 382, by Judge Beatty; U. S. v. Elliott (C. C.) 64 Fed. 27, by Judge Phillips; Casey v. Typographical Union (C. C.) 45 Fed. 135, 12 L. R. A. 193, by Judge Sage; American Steel & Wire Co. v. Wire Drawers' & Die Makers' Unions Nos. 1 and 3 (C. C.) 90 Fed. 608, by Judge Hammond; U. S. v. Sweeney (C. C.) 95 Fed. 434, by Judge Rogers; Otis Steel Co. v. Local Union No. 218, of Cleveland, Ohio, of Iron Molders' Union of North America (C. C.) 110 Fed. 698, by Judge Wing; Blindell v. Hagan (C. C.) 54 Fed. 40, by Judge Billings; U. S. v. Workingmen's Amalgamated Council (C. C.) 54 Fed. 994, 26 L. R. A. 158, by Judge Billings; Elder v. Whitesides (C. C.) 72 Fed. 724, by Judge Parlange; Wire Co. v. Murray (C. C.) 80 Fed. 811, by Judge Sage; Mackall v. Ratchford (C. C.) 82 Fed. 41, by Judge Goff; Southern R. Co. v. Machinists' Local Union No. 14 (C. C.) 111 Fed. 49, by Judge Hammond; U. S. v. Haggerty (C. C.) 116 Fed. 510, by Judge Jackson; Allis Chalmers Co. v. Reliable Lodge (C. C.) 111 Fed. 264, by Judge Kohlsaat; U. S. v. Weber (C. C.) 114 Fed. 950, by Judges Simonton and McDowell; U. S. v. Agler (C. C.) 62 Fed. 824, by Judge Baker; U. S. v. Kane (C. C.) 23 Fed. 748, by Judge Brewer; In re Reese (C. C.) 98 Fed. 984, by Judge Thayer; Farmers' Loan & Trust Co. v. Northern Pac. R. Co. (C. C.) 60 Fed. 803, by Judge Jenkins.

And the following are some of the decisions of the federal appellate courts on the different phases of injunctions against "strikers" and "boycotters": Hopkins v. Stave Co., 28 C. C. A. 99, 83 Fed. 912, Eighth circuit appeals, Judge Caldwell dissenting; Arthur v. Oakes, 11 C. C. A, 209, 63 Fed. 310, 25 L. R. A. 414, Seventh cir-

cuit appeals; Hagan v. Blindell, 6 C. C. A. 86, 56 Fed. 696, Fifth circuit appeals; In re Debs, 158 U. S. 564, 15 Sup. Ct. 900, 39 L. Ed. 1092; In re Reese, 47 C. C. A. 87, 107 Fed. 942.

And the following are some of the decisions of the state courts involving like questions, and questions akin to them, although some of them were not injunction cases: Com. v. Shelton, 11 Va. Law J. 324; In re Crump's Case, 84 Va. 927, 6 S. E. 620, 10 Am. St. Rep. 895; State v. Glidden, 55 Conn. 46, 8 Atl. 890, 3 Am. St. Rep. 23; Sherry v. Perkins, 147 Mass. 212, 17 N. E. 307, 9 Am. St. Rep. 689; Vegelahn v. Guntner, 167 Mass. 92, 44 N. E. 1077, 35 L. R. A. 722, 57 Am. St. Rep. 443; Shoe Co. v. Saxey, 131 Mo. 212, 32 S. W. 1106; Beck v. Protective Union (Mich.) 77 N. W. 13, 42 L. R. A. 407, 74 Am. St. Rep. 421.

In the Michigan case just cited a long list of state cases are cited. It is not necessary to set them forth again in detail, as the opinion in that case gives them. See, also, Murdock v. Walker, 25 Atl. 492, 152 Pa. 595, 34 Am. St. Rep. 678; State v. Stewart, 59 Vt. 273, 9 Atl. 559, 59 Am. Rep. 710; State v. Dyer, 67 Vt. 690, 32 Atl. 814; Barr v. Trades Council, 30 Atl. 881, 53 N. J. Eq. 111.

The English decisions are all cited in the opinions in the foregoing cited cases, as are the text-books by Story, Eddy, Moses, Pomeroy, and others.

I have cited these authorities as being in part those which sustain the authority and the duty to issue writs of injunction against violence to persons, against violence to property, against interference to business, against intimidation, and against the rights of contract and liberty. These authorities cannot be reviewed within the limits of an opinion of reasonable length. The rules to be deduced, with but a single exception, cannot be in doubt, and the authorities are not in conflict. And it does not matter whether we turn to the English cases, or to the federal cases decided on the circuit, to the decisions of the appellate courts of the United States, to the supreme courts of the several states, or to the text-books, old, or modern, we find a uniformity so remarkable as seldom to be found in other branches of our jurisprudence. They are all in favor of the rights of contract, of freedom, of the rights of property, and that no man or combination of men shall be allowed to interfere with another man, partnership, or corporation. The courts cannot hope to entirely foreclose discussion of these questions. But discussion is already nearly at an end by the courts, and by those having the slightest knowledge of jurisprudence. And capitalists and employers of labor and employés alike must understand that they must go elsewhere than to the courts for other results. And if they cannot go with confidence to the courts it is because they desire to go without conscience, and knowing they have a controversy without merit. Many of the questions of economy are not yet settled. But some day, when parties cannot be prevailed upon to agree, their disputes will be adjudicated by a court of chancery in a way satisfactory to all fair-minded men. If parties cannot agree they must arbitrate by agreement, and if they will not arbitrate they must have compulsory arbitration. And compulsory arbitration is neither more nor less than some proceeding,

in some judicial tribunal, compelling the party in the wrong to submit to a decree of that which is found to be for the right.

Capital or labor may in one case or in another case dominate the other; but in the end right and justice will dominate both, and what is right, and what is justice, will be decreed by a tribunal, by whatsoever name, having chancery powers. The liberty of contract and property rights will not be destroyed, and labor will not be reduced to slavery, and the public will not be ridden down for want of a tribunal; and that tribunal may be called by one name or by another, and it may be presided over by a man called "judge," or a "chancellor," or an "arbitrator," but such a tribunal will have chancery powers, and with all the powers developed by the growth of equity jurisprudence for the last 200 years, and the growth yet to come.

The foregoing authorities are in point in the case at bar, although some of them are what are called "boycott" cases, and some "habeas corpus" cases, and some are strike cases with physical violence, and others "picketing" cases.

As illustrative to them all I shall call attention to a few of them. In Allis Chalmers Co. v. Reliable Lodge (C. C.) 111 Fed. 264, it was said by Judge Kohlsaat:

"Where labor organizations whose members are engaged in a strike undertake to prevent the employer from carrying on its business by preventing other men from remaining in or entering its service, by systematically maintaining pickets around and about the entrances to its premises, virtually placing them in a state of siege, and it is shown that strikers and others incited by them have committed assaults upon workmen employed therein, and have employed threats and intimidation against such workmen to such an extent that the latter do not dare to leave their works through fear of bodily injury, and their employer is compelled to provide board and lodging for them within the premises, and other workmen are from the same reason prevented from entering its employment, to its irreparable injury, such state of facts clearly justifies the conclusion that the defendant organization and its members have not confined themselves to lawful methods of persuasion and argument, and they are engaged in a conspiracy to stop the business of the employer by intimidation and violence, which entitles the employer to protection by injunction against and continuance of such unlawful acts."

In the American Steel & Wire Co. v. Wire Drawers' & Die Makers' Unions Nos. 1 and 3 (C. C.) 90 Fed. 608–614, the defense was that, if there was no violence by the strikers, then the writ of injunction should not issue. But the court disposed of that by showing that there can be intimidation of those who want to work, by strikers, in many ways other than by assaults. The mere fact that the shops are picketed can only be intended for intimidation.

The fact that a line of pickets is immediately in front .of the shops, or a few blocks away, is a difference of degree only. Judge Hammond in the case just cited said:

"The whole fallacy of the defense against this bill and the proof offered to sustain it lies in a convenient apprehension or a necessary misunderstanding of the character of that force or violence which all agree is not permitted in the conduct of a strike. It seems to be the idea of the defendants that it consists entirely of physical battery and assaults, and that if these appear in the proof, and they can be justified, as they might be, on a criminal indictment or in a police court, that ends the objection, and the justified as-

saults and batteries will not support an injunction. The truth is that the most potential and unlawful force or violence may exist without lifting a finger against any man or uttering a word of threat against him. The very plan of campaign adopted here was the most substantial exhibition of force, by always keeping near the mill large bodies of men, massed and controlled by the leaders, so as to be used for obstruction if required. A willing wire worker, but a timid man, would be deterred by the mere knowledge of that fact from going to the mill when he desired to go, or had agreed to go, or, being already at work, feared to return through the streets where the men were congregated, or, having started, would turn back, fearing the trouble that might come of the attempt. Such a force would be violence, within the prohibition of the law; and its exhibition should be enjoined, as violating the property rights of the plaintiffs in the streets, their liberty of contracting for substituted labor, and the liberty of the substitutes to work if they wished to accept the lowered wages, and to pass through the streets to their work."

In the case of U. S. v. Elliott (C. C.) 64 Fed. 27–31, it was said by Judge Phillips:

"It is argued by counsel for defendants that courts of equity will not interpose by injunction to prevent the commission of an act which, when done, would be a crime penally punishable. This is an 'old saw.' It is a general rule of equity jurisprudence that courts of chancery will not interpose where there is adequate remedy at law, nor will they ordinarily interpose to prevent the commission of a crime. A well and long established exception to this rule is that where parties threaten to commit a criminal offense which, if executed against private property, would destroy it, and occasion irreparable injury to the owner, and especially where such destruction would occasion a multiplicity of suits to redress the wrong if committed, courts of equity may interpose by injunction to restrain the threatened injury. The law, it does seem to me, would be very imperfect, and indeed impotent, if a number of irresponsible men could conspire and confederate together to destroy my property, to demolish or burn down my house, that I should be remitted alone to the criminal statutes for their prosecution after my property was destroyed. It certainly presents a case that most strongly appeals to the strong arm of a court of equity to reach forth to prevent great injury and loss, as the only means of conserving the rights of private property. It is now a well-recognized office of a court of equity to conserve and preserve the rights of private property in advance of its molestation and appropriation, where, from the peculiar circumstances, the remedy at law might be of doubtful restitution."

In the case of Barr v. Trades Counsel, 53 N. J. Eq. 101–111, 30 Atl. 881, 884, it was said:

"No unprejudiced person at this day wishes to place any obstacle in the way of labor organizations conducting their operations within lawful limits. It is unfortunate that, despite the warning and counsel of accredited leaders, the reckless and revengeful among the members, with the vicious and lawless always to be found among the idle, so often take advantage of labor demonstrations to commit acts of violence against persons and property, and thus weaken the sympathy of the public with the system. Yet every one must acknowledge that organization has accomplished much in the past for the benefit of the workingman, and recognize its possibilities to secure to him, in the future, the enjoyment of other privileges. But, while engaged in this laudable purpose, those who give direction to affairs should not attempt to secure their ends by infringing the lawful rights of others. When they are accused of so doing, it is the province of the courts, when the question is properly presented, to define and protect the rights of those brought within their jurisdiction. In discharging this duty, judges can only decide on established rules, and are not empowered to create rights or initiate new powers or privileges. That is a legislative, not a judicial, function. It would seem to be unnecessary to state such elementary truths were it not that other views appear to be entertained by some."

Littleton v. Fritz, 65 Iowa, 488, 22 N. W. 641, 54 Am. Rep. 19, was decided in the year 1885 by the supreme court of that state. It was a case relating to the sale of intoxicating liquors. Statutes were in force in Iowa making it a crime to sell intoxicating liquors, or to keep them for sale, even though no sales were made. Such parties were indictable, and subject to a fine of $1,000. In addition to the fines imposed on conviction under indictment, the statute provides for a writ of injunction in an action in equity, by any citizen of the county, whether such person can show any injury or not. And for every violation of the injunction there should be imposed a fine of not less than $500 nor more than $1,000, or by imprisonment in the county jail not more than six months, or by both fine and imprisonment, in the discretion of the court. The Iowa constitution provides "that the right of trial by jury shall remain inviolate." Article 1, § 9. In the case just cited it was urged by eminent counsel that the statute was unconstitutional, in that the defendant could not be deprived of his liberty, and suffer long imprisonment, excepting after conviction by a jury. But the Iowa supreme court brushed away such cobweb arguments, and showed by argument, and by a long list of authorities, both English and American, that courts of equity from time immemorial restrained the doing of wrongful acts; and the fair and conservative and the great state of Iowa has been "governed by injunction," to the dismay of no one but law-breakers.

In the case of Shoe Co. v. Saxey, 131 Mo. 212, 32 S. W. 1106, the supreme court of that state, in the year 1895, in terms most unmistakable pronounced the law of cases like the one at bar. It was a "strike case." Parties desired to work and were at work for the shoe company. Other parties had been at work, but went out on a "strike." The strikers and others concluded that, to coerce the company, they would picket the shops; would intimidate the frail, the timid, and those who were opposed to violence, of those who dared to remain with the company, and thereby earn a livelihood for themselves and families. The contention in that case was made, and it usually is made in all these cases, that defendants cannot be enjoined by the writ of injunction, in an action in equity, from doing unlawful acts, or from committing crimes; and in that case the strikers most earnestly contended that they would have the right to trial by jury. The supreme court of Missouri in deciding the case adopted this language, which should be followed by all who imagine that the way to redress their own grievances, supposed or real, is to tyrannize over others, including those who have never done them wrong:

"Equity will not interfere when there is an adequate remedy at law. But what remedy does the law afford and what would be adequate to the plaintiff's injury? How would their damages be estimated? How compensated? The defendant's learned counsel cites us to the criminal statutes, but how will that remedy the plaintiff's injury? A criminal prosecution does not propose to remedy a private wrong. And, even if there was a statute giving a legal remedy to plaintiff, it would not oust the equity jurisdiction. The legal remedy that closes the door of a court of equity is a common-law remedy. Where equity had jurisdiction because the common law affords no adequate remedy, that jurisdiction is not affected by a statute providing a legal remedy. What a humiliating thought it would be if these defendants were really at-

tempting to do what the amended petition charges, and what their demurrer confesses; that is, to destroy the business of these plaintiffs and to force the eight or nine hundred men, women, boys, and girls, who are earning their livings in plaintiff's employ, to quit their work against their will, and yet there is no law in the land to protect them! The injunction in this case does not hinder the defendants doing anything that they claim they have the right to do. They are free men, and have the right to quit the employ of plaintiffs whenever they see fit to do so, and no one can prevent them; and whether their act of quitting is wise or unwise, just or unjust, it is nobody's business but their own. And they have a right to use fair persuasion to induce others to join them in their quitting. But when fair persuasion is exhausted they have no right to resort to force or threats of violence. The law will protect their freedom and their rights, but it will not permit them to destroy the freedom and rights of others. The same law which guaranties the defendants in their right to quit the employment of the plaintiffs at their own will and pleasure also guaranties the other employés the right to remain at their will and pleasure. These defendants are their own masters, but they are not the masters of other employés; and not only are they not the masters of the other employés, but they are not even their guardians. There is a maxim of our law to the effect that one may exercise his own right as he pleases, provided that he does not thereby prevent another exercising his right as he pleases. This maxim or rule of law comes nearer than any other rule in our law to the Golden Rule of divine authority: 'That which you would have another do unto you, do ye even so unto them.' Whilst the strict enforcement of the Golden Rule is beyond the mandate of a human tribunal, yet courts of equity, by injunction, do restrain men who are so disposed from exercising their own rights as to destroy the rights of others."

It is claimed by some that the Missouri supreme court has recently overruled or modified the foregoing opinion. But it is not so. That court did recently refuse to enjoin libelous publications, on the ground that the constitution of the state gives freedom to the press, holding the publisher liable for an abuse thereof,—a very different question from that decided in the case of Shoe Co. v. Saxey.

That all agreements cannot be regarded as valid contracts is conceded by all. They may be tainted with corruption, or an immorality, and the courts will not enforce them or give damages for their breach. Other agreements in conflict with good government, or of a sound and wise public policy, will not be enforced. There are others which if carried out would or might impair the health of the public, or of an individual, and will not be enforced, and legislation against such a contract will be upheld. Such a case was that of Holden v. Hardy, 169 U. S. 366–380, 18 Sup. Ct. 383, 42 L. Ed. 780.

Contracts for personal labor will not be enforced, and the laborer can terminate his contract at will, being responsible only in damages for not fulfilling his contract. If this were not so, then a person could sell himself into servitude for a period of years, or even for life, and in whole or in part lose dominion over himself; and this is so abhorrent that courts will not recognize such contracts. The only exception I know to this is in case of a seaman, where cargoes and lives are endangered by the perils of the seas.

The supreme court recently held in Robertson v. Baldwin, 165 U. S. 275, 17 Sup. Ct. 326, 41 L. Ed. 715, that, if a seaman makes a contract for his personal services for a definite, but reasonable, time, he can be coerced into carrying it out, and can be arrested and de-

tained in prison for a violation of his contract. But the force of that opinion is, in my judgment, much weakened by the dissenting opinion.

But there are two cases absolutely binding upon this court on every important phase of the case at bar. The one is the case of In re Debs, 158 U. S. 564, 15 Sup. Ct. 900, 39 L. Ed. 1092. The language of Judge Brewer is so pertinent, so apt, and so strong that, though often quoted, it is worthy of repetition in full. It is so full of patriotism and good sense, and with the principles of our government, and of good government, that it is commended to all pessimists and those who believe this country is going wrong. Space forbids its repetition here. But those who believe in the powers of our government, and that those powers are for the good of all, and that those powers are executed by the different agencies, among which are the courts, find much comfort in reading this opinion, unanimously concurred in, by the supreme court of the United States; and those who are predetermined to believe in the heresies of force, and intimidation, and violence, and a reign of terror, will regret the promulgation of that opinion.

The other case is that of Hopkins v. Stave Co., decided by the circuit court of appeals for this circuit, and reported in 28 C. C. A. 99, 83 Fed. 912. The decisions of that court being binding upon this court, if there were no other authority it is our duty to follow it. Judge Thayer, in the course of the opinion, said:

"While the courts have invariably upheld the right of individuals to form labor organizations for the protection of the interests of the laboring classes, and have denied the power to enjoin the members of such associations from withdrawing peaceably from any service, either singly or in a body, even where such withdrawal involves a breach of contract (Arthur v. Oakes, 11 C. C. A. 209, 63 Fed. 310, 25 L. R. A. 414), yet they have generally condemned those combinations usually termed 'boycotts,' which are formed for the purpose of interfering, otherwise than by lawful competition, with the business affairs of others, and depriving them, by means of threats and intimidation, of the right to conduct the business in which they happen to be engaged according to the dictates of their own judgments. The right of an individual to carry on his business as he sees fit, and to use such implements or processes of manufacture as he desires to use, provided he follows a lawful avocation, and conducts it in a lawful manner, is entitled to as much consideration as his other personal rights; and the law should afford protection against the efforts of powerful combinations to rob him of that right and coerce his will by intimidating his customers and destroying his patronage. A conspiracy to compel a manufacturer to abandon the use of a valuable invention bears no resemblance to a combination among laborers to withdraw from a given employment as a means of obtaining better pay. Persons engaged in any service have the power, with which a court of equity will not interfere by injunction, to abandon that service, either singly or in a body, if the wages paid or the conditions of employment are not satisfactory, but they have no right to dictate to an employer what kind of implements he shall use or whom he shall employ. Many courts of the highest character and ability have held that a combination such as the one in question is admitted to have been is an unlawful conspiracy, at common law, and that an action will lie to recover the damages which one has sustained as a direct result of such conspiracy; also that a suit in equity may be maintained to prevent the persons concerned in such a combination from carrying the same into effect when the damages would be irreparable, or when such a proceeding is necessary to prevent a multiplicity of suits."

Judge Caldwell dissented. But he dissented not so much that he did not agree to the above statements by Judge Thayer as to the law, but rather he did not believe the facts warranted an injunction.

The constitution of the United States provides: "In all criminal prosecutions the accused shall enjoy the right to a speedy and public trial." Amend. art. 6. And by another provision: "In suits at common law, where the value in the controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." Amend. art. 7. And the constitution of the state of Nebraska (article 1, § 6), the same as in Iowa, provides that "the right of trial by jury shall remain inviolate."

By reason of these and similar constitutional provisions, there has been within the last few years a great deal of inflammatory public speech and literature, all proclaiming that in no proceeding other than by jury trial can any person be subjected to a fine or imprisonment; and it is no wonder that so many persons have been deceived, and made to believe that the courts are usurping authority in dealing by injunction with those who interfere with the rights of others. If any case, English or American, federal or state, could be found upholding such a claim, it could be said to be debatable. But no such case exists. When these constitutions were adopted courts of equity existed, and equity jurisprudence was recognized. And as plain as are these constitutional provisions, they are continuously misunderstood, because they are not correctly read. The provision above quoted from the United States constitution does not say that in all cases the right of trial by jury shall exist. But in the one case it shall·exist in all criminal prosecutions, and in the other the right of trial by jury in common-law actions shall be preserved.

In the Nebraska constitution (article 1, § 6) the provision is "the right of trial by jury shall remain inviolate." In neither case is the right to be enlarged. In the one case it shall be preserved, and in the other remain, as it was. And whether to be preserved or remain as at common law, or as of the date of the adoption of the constitutional provisions, is not now material. But the cases cited have to all lawyers and all courts forever put these matters at rest.

All the cases are in harmony with no single exception save and excepting on one point not involved in this case; and that is, some of the courts hold that if the act complained of were done by one person only, and such act of itself would not be unlawful, then similar acts done in concert by many would not be unlawful. And this seems to me to be the reasonable holding. I cannot understand how two lawful acts, or the lawful act by each of two persons, can make an unlawful act, any more than I can believe that two ciphers can make a unit. And Judge Holmes, now of the supreme court, is often cited as giving expression to the correct rule in his dissenting opinions in the Massachusetts case hereinbefore referred to, and excerpts from his opinions are often found. But aside from the partial quotations from his opinions, and aside from the one exception stated, strikers guilty of threats, violence, or intimidation by pickets or otherwise can find no comfort by reading in its entirety his dissent in the case of Vegelahn v. Guntner. And in line with that part of the

dissent of Judge Holmes, referred to, is the bill now pending in congress, which has already passed the house, commonly called the "Hoar Bill," with which I agree, as already being the law.

The fifth amendment to the constitution of the United States provides that "no person shall be deprived of life, liberty or property without due process of law"; thereby meaning that neither congress nor any other governmental agency shall ever deprive any person of either liberty or property excepting by due process of law. And the fourteenth amendment to the constitution of the United States provides that "no state shall deprive any person of life, liberty or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." And the word "person" means also a corporation, as many times decided by the United States supreme court.

And that one's business is his or its property is likewise elementary, and is conceded by all. And that liberty means the right to do as he pleases, when he interferes with the rights of no other person, and the right to make contracts with all persons upon all subjects-matter, save and excepting with reference to immoral and unlawful matters, is also conceded by all who know anything of the propositions. And as to what the rights of property mean, and of what liberty of contract consists, of all that has been written upon these all-important and most vital questions there is no paper of greater ability, evidencing more learning, than the very recent opinion of the supreme court of Wisconsin in the case of State v. Kreutzberg, 90 N. W. 1098.

I believe, and that without a doubt, that, in so far as propositions are involved in this case, the law is as follows:

(1) The defendants acted within their right when they went out on a strike. Whether with good cause, or without any cause or reason, they had the right to quit work for the Union Pacific Railroad Company, and their reasons for quitting work were reasons they need not give to any one. And that they all went out in a body, by agreement or preconcerted arrangement, does not militate against them or affect this case in any way.

(2) Such rights are reciprocal, and the company had the right to discharge any or all of the defendants, with or without cause, and it cannot be inquired into as to what the cause was.

(3) It is immaterial whether the defendants are not now in the service of the company because of a strike or a lockout.

(4) The defendants have the right to combine and work together in whatsoever way they believe will increase their earnings, shorten their hours, lessen their labor, or better their condition, and it is for them, and they only, to say whether they will work by the day or by piece work. All such is part of their liberty. And they can so conclude as individuals, or as organizations, or as unions.

(5) And the right is also reciprocal. The railroad company has the right to have its work done by the premium or piece system, without molestation or interference by defendants or others. This is liberty for the company, and the company alone has the right to determine as to that matter.

· (6) When the defendants went on a strike, or when put out on a lockout, their relations with the company were at an end; they were no longer employés of the company; and the places they once occupied in the shops were no longer their places, and never can be again, excepting by mutual agreement · between the defendants and the company.

(7) No one of the defendants can be compelled by any law, or by any order of any court, to again work for the company on any terms or under any conditions.

(8) The company cannot be compelled to employ again any of defendants, or any other person, by any law, or by any order of any court, on any terms, or under any conditions.

(9) Each, all, and every of the foregoing matters between the company and the defendants are precisely the same, whether applied to the company or to the defendants.

(10) The company has the right to employ others to take the places once filled by defendants; and in employing others the defendants are not to be consulted, and it is of no lawful concern to them, and they can make no lawful complaint by reason thereof. And it makes no difference whether such new employés are citizens of Omaha or of some other city or state. A citizen of Chicago, or from any state in the Union, has the same rights as to work in Omaha as has a citizen of Omaha.

(11) Defendants have the right to argue or discuss with the new employés the question whether the new employés should work for the company. They have the right to persuade them if they can. But in presenting the matter they have no right to use force or violence. They have no right to terrorize or intimidate the new employés. The new employés have the right to come and go as they please, without fear or molestation, and without being compelled to discuss this or any other question, and without being guarded or picketed; and persistent and continued and objectionable persuasion by numbers is of itself intimidating, and not allowable.

(12) Picketing in proximity to the shops or elsewhere on the streets of the city, if in fact it annoys or intimidates the new employés, is not allowable. The streets are for public use, and the new employé has the same right, neither more nor less, to go back and forth, freely and without molestation, and without being harassed by so-called arguments, and without being picketed, as has a defendant or other person. In short, the rights of all parties are one and the same.

It remains to examine the evidence, and ascertain whether any of the foregoing matters and things and rights have been trampled upon by the defendants, and, if so, by whom, and who are responsible.

The complainant, with its thousands of miles of railroad, has shops at various places, and a large one at Omaha, where much work is done on its cars, engines, and other appliances. Most of the defendants were employés in the Omaha shops. About May 12, 1902, certain shopmen, through committees, presented to the company what they claimed were grievances. Conferences were held, but without result. About that time the company determined to carry on

the work in its shops, and pay by the piece or by premium. The argument for the company is, I assume to be, that all employés would get at least a minimum price per day. And those of experience, and the sober and industrious, and skilled and rapid, would get such additional price as might thus be earned by the piece or premium, thereby giving recognition to merit and efficiency, while those who were without experience, and not sober, and not industrious, and not rapid, and the laggard, would get the minimum only per day.

On the other hand, I assume that the strikers make the argument that it is better that the less capable and less efficient, as well as the best, be paid the same sum per day, and that labor would thereby be elevated, and be for the common good of laboring men. But it resulted, as some say in a strike, and as others call it a lockout. Notices were given and posted by the company that the outgoing employés must return at once to their work. They did not return, but from that time on they all continued on the strike, and the strike is still on. The company employed many new men for the shops, some of them citizens of Omaha, and some from other states, to take the places once occupied by the strikers. The strikers have almost daily had meetings in a hall. A system of pickets from their own number was organized. These pickets were officered by captains and lieutenants, to place the pickets and command them. These pickets were sometimes placed singly, but generally in squads. They were placed in close proximity to the shops, and more particularly at the gates leading to the shops. Sometimes they would be on the streets some blocks away from the gates, but at points where it was known the present employés must, or probably would, pass.

The officers of the pickets gave orders that the pickets must reason and argue with the new men, and those refusing to go on the strike, and try and persuade them that they were fighting labor, and in working for the company they were in hostility to the interests of the laboring men, and that they ought to quit. The defendants' position is, as they admit in evidence, that, if they could take from the company all men from the shops, the engines would not be repaired, and that the motive power would be destroyed. Such is their avowed purpose. Then the company would either be compelled to cease carrying passengers, freights, and mail, or, if it continued in business, would be compelled to re-employ the strikers on the terms named by the strikers.

The question of fact in this case is this: Have the methods to destroy the motive power of the company been by argument and persuasion and by peaceable methods? If so, the writ of injunction, under the law as evidenced by the authorities cited, should be denied. Or have the methods to destroy the motive power of the company been attended with assaults and violence and intimidations and terrorizing? It is undisputed that, so far as known at least, the orders of the lodges, and by the officers, were to use none but peaceful methods, by argument and persuasion. Directions were given that all pickets must not drink liquor, and to wholly refrain from all improper

conduct, under penalties of discipline, including fines. The evidence shows that many of defendants are peaceable and orderly men, and that many of them in person have committed no assaults, nor have they been guilty of any acts of violence or intimidation. And many of defendants named in the bill, in my judgment, should not be named in the permanent injunction to be issued herein, for the reason there is no evidence to warrant such holding against them. It is contended that the writ should issue, even though the evidence is meager or wholly lacking. And statements to that effect can be found in some of the cases of the federal trial courts; "that the writ of injunction can do no harm to a law-abiding man, even though not warranted by the evidence." I do not so believe. I would resist such an application for two reasons. (1) I should not be mulcted in the costs. (2) I should not be humiliated by having an injunction run against me, when there is no evidence that I have done, or, so far as the evidence shows, am not likely to do, any of the things complained of, and am not acquiescing, by silence or otherwise, in what my co-laborers, or men in a class of which I belong, are doing. There must either be evidence against such parties, or the evidence must show that such parties belong to the class or to the organization of those to be enjoined.

Certain parties, to be mentioned in the decree, will be dismissed from the case. But they will be held to have knowledge of this opinion and of the decree herein. And those in any way related in a business way to the other defendants; those who are servants, agents, or employés of the defendants who are enjoined; and those who are fellows or companions of defendants, who are strikers,—are and will be bound by the writ of injunction issued herein, to the same extent and as fully as if named in the writ. In re Reese, 47 C. C. A. 87, 107 Fed. 942; Ex parte Lennon, 166 U. S. 548, 17 Sup. Ct. 658, 41 L. Ed. 1110. And any action by those dismissed from the case, as well as all others, in any way in conflict or in violation of the writ of injunction, will subject themselves to the same penalties as though they were named in the writ of injunction. So that the order of injunction herein will not include by name those against whom there is no evidence, yet the writ will include, in effect, all those who quit the company's service, and are engaged in the strike, with the purpose of compelling the company to re-employ them by attempting to impair the motive power of the company or otherwise cripple its service. In other words, the class of men will be controlled by the injunction, and the class of men above alluded to will not violate the writ, excepting at their peril.

And the writ of injunction will be read by all in the light of this opinion. Some of the defendants, as the evidence shows, have been guilty of most inexcusable offenses, and some of conduct the most outrageous and brutal, in carrying on the general design of destroying the motive power of the road by preventing its repair or replacement. In some instances those guilty of misconduct and intimidation and terrorizing and brutalities were not identified, and it cannot be said that all were done by the strikers, because part of it was done by sympathizers.

Much of the intimidation was by language so low and coarse and brutal and vulgar and obscene that no one of the counsel in this case would excuse me if I were to repeat it. Suffice it to say that never before have I been compelled to read anything so villainously vulgar and obscene as in this case. And this vulgarity was invariably prefixed with the most execrable oaths. More than this cannot be said as to the language of intimidation, unless I should recite the language itself. The evidence is in the record of the case, and can be read by those who desire to do so. This language was used by a limited number of defendants, and invariably, or at least generally so, in the presence of part of the other defendants. Some of the pickets at times were under the influence of liquor. But it is a fact to be regretted that, of the many acts of drunkenness, vile language, and assaults, not in a single instance, so far as the evidence shows, was a party thus guilty informed against before the municipal authorities by any striker, or was he subjected to any kind of discipline by the lodges or officers of the strikers. It is one thing to advise peace and good order and gentlemanly conduct. But talking about and advising peace and good order and gentlemanly conduct, and then taking no action against violence and drunkenness and assaults and blackguardism and profanity, to me do not square themselves.

Many of defendants were witnesses in their own behalf, and they testified to the orders as to the way the strike should be conducted, and that they, with few exceptions, saw no violence, and heard no improper language. Others, not of the strikers, testified that they saw and heard nothing wrong. Some of those who did see acts of violence mitigate them, and in some cases justify them. And in some few instances the assaults as alleged have been disproved. And in some cases where acts of violence were testified to by apparently credible witnesses they were not even denied by those of defendants charged to be guilty. And of the many things, including murder, charged and established, a great many are referred to as "scraps," "mixups," and "fights."

Before the strike the employés in the shops were in no way guarded. There were watchmen to keep off trespassers, but not to protect the employés. The watchmen have been more than doubled in number, and some are now armed. Before the strike they were not armed. Before the strike every employé boarded at his own home or the boarding house of his own choice. Since the strike the greater part of the employés have felt compelled to eat and sleep and remain inside the shops. For that purpose the company has been compelled to fit out and maintain at great expense these inside boarding houses, so that the men can eat and sleep without molestation. A large number of cooks are employed by the company to serve in the improvised kitchens of the shops. For the men, or many of the men, who desired to leave the shops and go into the city during non-working hours, guards have been employed to accompany them, and protect them from harm, and which at times were unsuccessful efforts. Sometimes men in the city called on policemen to act as escorts back to the shops. For that they are called cowards, forgetful that

it is not always the coward, but generally the law-abiding man, that seeks protection. Many employés have been assaulted: Michael Cronin, who recognized four strikers as his assailants. Cronin has been a resident of Omaha for nearly 40 years. Fred Wyss was struck in the head, hit with a club, and kicked in the head when down. Henry Guinotte was struck in the eye, knocked down, struck twice more, kicked in head, and laid up two weeks. L. Frank was struck on the head and ran away. Came back later, and was struck again, and was laid up 14 days, his face swollen and discolored. He identified a striker by the name of Richilieu, who figures in more assaults and indecencies than any other one man. It is a marvel that so far he has kept out of the penitentiary. Another man was assaulted, his spectacles broken. One of the strikers pulled something from under his coat, struck the man, and knocked him down. He vomited as a result of his injuries, and was bloody. The spectacles were exhibited to us in court. The frames were twisted out of shape, one glass fractured, and the other gone. Another man was surrounded by strikers, who tore open the bundle of clothing he had, and went through his pockets. Another man was kicked by a striker. Upon another occasion men inside the shop were stoned from the outside. A Mr. Sweeney was assaulted by strikers headed by Richilieu. Upon another occasion he was again assaulted and struck in the face. There are 10 other assaults, some less severe and some more severe than those above mentioned. And they were all committed since the commencement of the "picketing." In most instances the assailants were recognized as pickets, and in many cases the particular individual or individuals were recognized, and in a large number of cases no denial made by evidence. Bad as is the foregoing, it is not all. Threats were made by pickets towards the men employed. Vile names were applied to them. The very common salutation was that of "you scab," and generally prefixed with profanity and vulgarity as coarse as can come from the tongue. The same man Cronin was told that it would be made disagreeable for him, and that his wife would be made a widow. Buckley had his life threatened if he went inside the gates to the shops. Another man was warned to not go to the shops again, and was told that he would be thrown into the river if he did. A lady wanted to go into the shops to see her husband, but was denied the privilege, and was driven back by the pickets. Another lady was called on at her house by a man, and was told her husband must quit work, saying he knew the rules of the strikers, and that she would find out what would be done. Another man was cursed in the presence of his mother, and was told that he must either stay inside or out of the shops. Men were stopped on the streets, and compelled to listen to arguments by "persuasion" as to whether they were doing right in taking the places of the strikers. There are many instances in addition to the foregoing wherein threats were made if they did not cease to work. Vulgarity such as I have attempted to describe without reciting it was used on a very great number of occasions. A Mrs. Albertson, wife of an employé, received a letter by due course of mail, of which the following is a copy:

"Omaha Lodge, No. 31, Omaha, Nebraska.

"International Association of Machinists.

"Omaha Lodge No. 31.

"Office of Recording Secretary, Postoffice Box 702.

"Omaha, Nebraska, August 11th, 1902.

"Mrs. E. P. Albertson—Dear Madam: It has come to the notice of this body that your husband has taken a striker's place at Columbus, Nebraska, in the Union Pacific penitentiary. He has only left the car twice to come up town, and then in the company of guards. We hope you will see the humiliating position it places you in, for your husband will be recognized wherever he goes from the picture and description which we take of every scab in the employ of the Company. It will be very humiliating for you, if you should be on the street with him, to have him pointed out as a scab. You have the right to demand the honor and esteem promised at the marriage altar, and we hope you will see the justice of our appeal, and bring all possible pressure to bear upon him, and save him from the scorn and hatred of his fellows.

"Very respectfully,　　　　　　　　　George Smith, President.
　　　　　　　　　　　　　　　　　　"George Lamb, Secretary."

The writing of this letter or the signatures were not established, and for that reason was objected to. But the astounding fact exists that one of the men whose name purports to be signed to the letter was called as a witness for defendants, and he made no denial of this letter. By reason of the letter, the lady begged her husband to quit work.

Three instances were testified to in which the pickets searched the employés, when to avoid trouble they denied their occupation, to ascertain if they carried pass books or time checks, and in another instance such evidence was demanded. Employés were photographed by kodaks, with the remark "we can identify you now."

More than a dozen of the pickets were identified. In other cases they were identified as strikers or pickets. In other cases the assailants and violators of the rules of decency were not known. But no man who has read the 1,186 pages of evidence which I have read can have the slightest doubt but that these assaults, and these acts of violence, and these threats, and these blasphemous denunciations would not have occurred but for this picketing. Many of the defendants took no part in them, being honorable men. No doubt whatever is there in my mind but that a great many of the defendants deprecate it. But deprecation ought to be accompanied by words of denunciation. But both deprecation and denunciation ought to be accompanied by some affirmative acts to stop it, or at least to cut loose from such men.

Picketing, as evidenced by the facts in this case, is wrong, and cannot be countenanced by law-abiding men, and such picketing cannot but be condemned by any court. As said before, the rights and duties and obligations of employer and employé are reciprocal and the same in requiring fair treatment. And, if one unfairly treats the other, such other cannot retaliate by some other unlawful act. Suppose the company would arm all of its employés in the shops, and with the guards would go to assaulting and threatening and villifying and intimidating the pickets; would any self-respecting man indorse it? Would we not then surely have a reign of terror in Omaha?

Suppose the company would place pickets in front of the residences of the strikers, and on the streets they pass, to and from their homes; would any one indorse it? Omaha, I assume, has an efficient police force of the usual number. The chief of police testifies that the company asked him for a detail of 25 policemen for protection. But 15 was all he could furnish. But after this the pickets were stationed over the streets farther away, and the policemen and guards did not, because they could not, bring these things to an end. These pickets by turn, or allotment, were on the streets, and in front of the shops, during and generally until 11 o'clock at night, but never later, until the occasion now to be mentioned.

On Monday morning, September 15, 1902, the restraining order herein was signed. Two days prior, or on the morning of Saturday, September 13th, it was ordered that pickets be and remain all night at their accustomed places. Why this was ordered has not been made to appear. Nothing unusual in the shops or in relation to the strike had occurred. No one believes that the great body of strikers anticipated coming events. But the order for picketing all of that Saturday night was made. A few minutes after midnight two men by the names of Caldwell and Ball, workmen, were returning to the shops for the night, where they were lodged and boarded. At the intersection of Cass and Twelfth streets, which was a block from the gates to the shops, and a less distance from the company's tracks, was an electric light. Men could be easily identified. As Caldwell and Ball approached the point named they saw five or six men. Most of them they recognized as strikers. Ball believed there was to be trouble, but Caldwell thought not. The pickets stopped them, and asked them where they were going. Caldwell said, "To the shops." Then Caldwell said, "I tell you, boys, we don't want any trouble. Now, I just come last Thursday, and as soon as I get money enough I will go back to Chicago." Immediately Caldwell was struck in the jaw, knocking him into the ditch. Ball started to assist Caldwell, when two men jumped on him. He got loose, and started to run, and fell down, when he was hit with a club. He finally got away, and threatened to shoot the assailants, but ran away, and then he was stoned. After Caldwell was down, he was either struck or struck at with a club. Caldwell got up, walked inside the gates, and in a few minutes was dead; murdered. This generally is the evidence of Ball. George L. Perkins, a striker, testified that Ball and Caldwell were going to the shops. The pickets headed Ball and Caldwell off two or three times as they would turn from one side of the street to the other. He says Caldwell said: "It is just like this boys, we come from New York, without knowing there was a strike, and our baggage is in there, and I swear to God that we will go in there and come out tomorrow and bring our baggage out with us." Caldwell was begging for his life. He had been in the shops, and was not from New York. He was from Chicago. This witness says there were five of them, in addition to Ball and Caldwell. Some of the evidence is to the effect that there were six. He says that this is all that was said. Then Caldwell was knocked into the ditch a foot and a half deep. The men present were as follows: George L.

Perkins, a striker; Henry Spellman, a striker; John Spellman, not a striker, but a son of Michael Spellman; R. Chadwick, a striker; John McKenna, not a striker, but evidently a sympathizer. Ball says that Charles Pospisil, a striker, was present. This Pospisil denied. It was John Spellman who knocked Caldwell into the ditch. Who struck Caldwell afterwards, the witnesses differ. John Spellman at the time was working for an independent contractor, who had a contract for building for the railroad company. But he was not in the employ of the company. He without doubt was in sympathy with his father, a striker, and his fellows. Be all this as it may, Caldwell was murdered, and murdered because he wanted to work in a place vacated, and murdered as a result of picketing. John Spellman is under arrest for the crime.

The defendants claim to have the belief that physical violence alone is to be condemned. But all persons know that intimidation by words, by menaces, by numbers, by position, and by many things is just as effective as by using clubs or brass knuckles or knives. Aggressive or daring employés would be deterred by none of the unlawful acts. But there are two classes of employés who are deterred. One class is the frail and the timid. And they are entitled to protection. Another class, comprising the greater part of men of this country, the law-abiding peaceable men, those who do not engage in brawls, and who never fight excepting when driven to the wall. They are entitled to the protection of the law, and the complainant has the right to have them protected.

This "picketing" has been condemned by every court having the matter under consideration. It is a pretense for "persuasion," but is intended for intimidation. Gentlemen never seek to compel and force another to listen to the art of persuasion. To stop another on the street, get in his road, follow him from one side of the street to another, pursue him wherever he goes, stand in front of his residence, is not persuasion. Intimidation cannot be defined. Neither can fraud be defined. But every person knows whether his acts are fraudulent, and he knows whether his acts are intimidating. And the courts, when the facts are presented, adjudge accordingly. And so in this case. And this court retains jurisdiction of this case, and, should the necessity require, will from time to time adjudge whether the acts of defendants, or any of them, are of an intimidating character, and any man who respects the rights of others will have no fear of the result; and those, should there be any, who do not respect the rights of his fellow man, will be controlled by the injunction.

Are all the foregoing facts, supplemented with the brutal murder, evidence of intimidation and terrorizing? If not, what can be? In some instances the employés were drunk and quarrelsome. But very few of the assaults were provoked or brought on by the employés. It is the system of picketing that did it, and it is unlawful, and must be enjoined.

The restraining order prohibits the strikers from "following" the employés to their homes or on the streets. It is contended that one man has the right to walk on the streets in the same direction an-

other man is going. But that is not "following," as every one understands what "following" means. No striker can fail to understand what it means. But, to avoid criticism, the injunction will be so worded as to be understood by all. And the writ of permanent injunction will issue, and the unlawful picketing and the wrongful interference with the rights of others will be brought to an end.

MUNGER, District Judge. Complainant in its bill alleges it is a corporation organized under the laws of Utah, and a citizen of said state, and engaged in the operation of a railroad in different states of the Union. That in the operation of its road it is engaged in the carriage of interstate commerce and the United States mail. That the respondent P. J. Conlon is a resident and citizen of the state of Ohio, the respondent George Mulberry is a resident and citizen of the state of Illinois, the respondent Thomas L. Wilson a resident and citizen of the state of Wyoming, and that each and all of the other respondents are residents and citizens of the state of Nebraska. That it is absolutely necessary and essential to enable it to conduct its operations and carry on its business as a carrier of freight, passengers, and the United States mail to maintain and operate its shops at Omaha, Neb. That on or about July 1, 1902, a large number of the boiler makers, machinists, and blacksmiths theretofore in its employ at its shops left its service, and went out on what is commonly known as a "strike." That thereupon it became and was essentially and vitally necessary that it should employ other boiler makers, machinists, blacksmiths, and mechanics to carry on the necessary work at its shops. That the respondents, constituting a number of said parties formerly in its service, and others, soon after they went out upon said strike, instituted and have ever since carried on a system of attack not only upon complainant, but also upon the parties employed by it in its shops at Omaha. That all the respondents conspiring, confederating, and colluding together for the purpose of destroying complainant's property, and for the purpose of terrorizing and intimidating its employés, have been and are committing depredations upon and invaded its property and premises, surrounded its cars occupied by passengers, and hurl vile and indecent epithets against its employés and guards, kick, strike, bruise, and assault its employés and guards, and by different and various means intimidate and terrorize its employés, and have so done to an extent that a number have quit and left its service. That they tell the wives of its employés that they will kill their husbands unless they leave and quit its service. That they have established what are called "picket lines" and pickets, who congregate about and near the premises of complainant, and by their conduct, acts, oaths, threats, and epithets have created and are carrying on a reign of terror at and about the premises of complainant, and thereby intimidate and prevent persons and employés from entering or continuing in its employ, and prevent the free access of its employés to its shops and premises. That complainant has constructed and maintains a fence surrounding its property and premises at Omaha, with gates or entrances. That the respondents congregate at and

near the gates and entrances, and have so intimidated and terrorized drivers of teams and wagons that they refuse to deliver goods at the shops and premises of complainant. That by reason of the aforesaid acts complainant has been compelled to employ a large number of guards to protect its property and the persons of its employés, at an expense of several thousand dollars therefor. That respondents follow its employés through the streets of Omaha, and assault, strike, maim, and seriously injure them. That said acts seriously impede and interfere with complainant in the conduct and management of its business. The bill prayed for an injunction restraining respondents from further committing the unlawful acts complained of. A restraining order was granted as prayed, and a time fixed for hearing the application for a temporary order of injunction.

Respondents have filed a joint answer, admitting the citizenship of the parties; the corporate character of complainant; that it operates a line of railroad and maintains shops at Omaha, as stated; that on or about July 1, 1902, a large number of the boiler makers and blacksmiths left complainant's service on what is generally known as a strike; that complainant has contracts with the United States government for transporting the United States mail, and is liable to fines and penalties for a failure to transport the mails in accordance with such contracts; that unless the complainant is able to employ and keep in its service workmen in its shops to keep its engines and cars in repair it will be unable to transfer such mail and discharge its obligations to the government; that the impairment of its mechanical powers will result in the impairment of its motive power, and interfere with the comfort and convenience of the general public. They deny all other allegations of the bill.

The evidence, at the request of parties, was taken before a stenographer, and parties have submitted the case to the court upon a stipulation that the hearing should be a final one, upon the pleadings and proofs thus taken.

As to 56 of the respondents, who will be named in the decree to be entered in this case, there being no evidence that they, or any of them, were ever in the employ of complainant; that they in any manner participated in, counseled, advised, or had knowledge of the strike, or any of the acts of violence, threats, or intimidation; and there being no evidence that they were at or near the premises of complainant during any of the times mentioned in the bill of complaint,—the action as to them should be dismissed.

The evidence in the case shows the following facts: That complainant has machine shops located at the city of Omaha, in the state of Nebraska, and that early in May last representatives of the International Machinists made a request upon complainant for an increase of pay and the modification of certain rules of complainant company. Negotiations were had with respect thereto until June 30th, when, no agreement having been reached, the machinists belonging to the union in the employ of complainant at its shops in Omaha went out on a strike. Negotiations also were had between a committee of the Boiler Makers' Union and officials of complainant for the purpose of obtaining an increase in pay and modification of cer-

tain rules. No agreement having been reached, the boiler makers belonging to the union struck on June 21st. The blacksmiths working at complainant's shops struck and left complainant's employ on July 5th. After the strike the three organizations, to wit, the machinists, the boiler makers, and the blacksmiths, in conjunction, established pickets at and near the several entrances to complainant's premises in said city. After the establishment of said pickets, and between July 14th and September 13th, upwards of 20 assaults were made upon parties who had entered the employ of complainant to take the place of strikers, in one instance resulting in the death of the party assaulted within a very few moments after the assault. The assaults were almost invariably accompanied by threats and abusive language. On many occasions after said strike, up to the time of the granting of the restraining order in this case, threats and abusive language, unaccompanied by assaults, were made to the new employés of complainant. The wives of some of the employés were notified that their husbands would be injured unless they left the complainant's employ. Threats were made that the photographs of employés had been and would be taken that they might be identified in the future. Several employés quit work through fear and many remained on the premises. As a result of such action complainant established upon its premises a hotel for the purpose of boarding and lodging its new employés, to avoid their coming in contact with the strikers, and employed a large number of extra guards to protect its property and premises from injury and trespasses. Some of the assaults were made by strikers and some by parties not identified. Many of the strikers who did picket duty did not commit any acts of violence or use any abusive or threatening language. This state of affairs continued until September 15th, when complainant filed its bill in this case.

It is stipulated between the parties that the respondents in the action are financially irresponsible for any damage which the complainant may have sustained or may sustain in future by reason of the acts complained of.

In the determination of this case the following principles of law are to be considered and applied to the facts, as shown by the evidence:

The mere fact that respondents, or some of them, struck and left the employ of complainant was not of itself unlawful. Any person has a perfect right to quit the employ of another when the compensation or conditions and regulations under which the service is rendered is unsatisfactory, if by so doing he violates no contract obligation. On the other hand, it is equally the right of any person to engage in any lawful employment at such compensation and under such rules and regulations as may to him be satisfactory.

Picketing, in and of itself, when properly conducted, is not unlawful; but when accompanied by violence, or any manner of coercion or intimidation, to prevent persons from engaging in the service of an employer, it is unlawful.

A court of equity has jurisdiction to restrain, on the application of an employer, parties from interfering with the free and unre-

stricted conduct of any lawful business on the part of such employer, and also to restrain parties who by violence, threats, or intimidation prevent or attempt to prevent persons from entering into or remaining in the employ of such employer, when such employer has no proper and adequate remedy at law.

These propositions have been so long and so often recognized and enunciated by the courts of the states and nation that they may be regarded as maxims of the law. Their correctness is in no manner controverted by counsel for respondents, their contention being that the evidence in this case does not warrant their application in a manner that will entitle complainant to the relief asked. It is argued on behalf of respondents that the bill should be dismissed, as complainant has an adequate remedy at law, in that it may invoke the power of the state to punish, under the provisions of the criminal code, violations thereof, such as the assaults and threats of violence shown by the evidence in the case to have been made. This proposition was fully answered by the court in Cumberland Glass Mfg. Co. v. Glass Bottle Blowers' Ass'n of U. S. and Canada (N. J. Ch.) 46 Atl. 208, 210, as follows:

"The defense insists that the bill sets out a series of trespasses or crimes, and that this court is asked to enjoin the commission of further similar trespasses or crimes. The jurisdiction of the court of chancery to enjoin a continuing trespass or injury to property, although it may involve a crime, is entirely settled. The court ignores the crime, and protects the complainant's property or business from civil injury."

In Vegelahn v. Guntner, 167 Mass. 92, 44 N. E. 1077, 35 L. R. A. 722, 57 Am. St. Rep. 443, it was said:

"Nor does the fact that the defendants' acts might subject them to an indictment prevent a court of equity from issuing an injunction. It is true that ordinarily a court of equity will decline to issue an injunction to restrain the commission of a crime; but a continuing injury to property or business may be enjoined, although it may also be punishable as a nuisance or other crime."

The same rule was announced in Barr v. Traders' Council, 53 N. J. Eq. 101, 30 Atl. 881; Cranford v. Tyrrell, 128 N. Y. 341, 28 N. E. 514; Port of Mobile v. Louisville & N. R. Co., 84 Ala. 115, 4 South. 106, 5 Am. St. Rep. 342; Arthur v. Oakes, 63 Fed. 310, 11 C. C. A. 209, 25 L. R. A. 414; In re Debs, 158 U. S. 564, 15 Sup. Ct. 900, 39 L. Ed. 1092.

It is strenuously argued, and the main contention on the part of the respondents is, that as the evidence shows that but a very small number of the strikers engaged in any assaults or threats made, or committed any unlawful acts, that as to those who did not commit any unlawful act the injunction should be denied; that the action is based upon a conspiracy entered into on the part of respondents, and that the evidence does not warrant any finding of conspiracy as to them.

Mr. George Smith, one of the striking machinists, testified that since the strike he had been present at nearly every meeting of the machinists and their helpers that had been held, and presided thereat. That meetings were held daily. That the blacksmiths, boiler makers, and their helpers also held daily meetings at the same building.

"These meetings thus composed have placed pickets in the streets where they would meet men passing in and out of the shop. The duties of these pickets was discussed at our meetings. The object of the picketing was to get all the machinists that would come in there and take our places to stop work, so that the company would not have men to do its work unless it came to the International Union. The pickets were instructed on seeing men passing in or out of the yards to inform them there was a strike, and that they would not be loyal to fellow workmen if they took the work under those conditions; and they were further instructed by them, if possible, not to accept a job while the strike was on. They have succeeded in persuading a great many not to do so. A great many men have been shipped in here who did not know that a strike was on. It was our aim to inform them of the strike, and to persuade them not to go to work. The pickets were further instructed that if they committed any acts of violence their strike benefits would be stopped, and that we would not allow anything of the kind. They were instructed not to use vile words, blasphemy or abuse, sauce, or anything of the kind. They were told nothing could be gained by improper conduct, and that it would only bring us into disrepute."

Had all the respondents fully adhered to the instructions thus given, it is quite probable that this court would not have been called upon by complainant for relief. But the directions thus given, the evidence abundantly shows, were not heeded. Assaults were frequently made upon those endeavoring to work, and vile, threatening, and opprobious epithets continuously applied to them by numerous of the respondents, as well as by others who had not been in the employ of the complainant, and who did not belong to the unions. The evidence does not disclose that any of these unlawful acts and acts of violence were ever disapproved of by respondents, that the guilty ones were remonstrated with, that their strike benefits had been stopped, or any protest had been made against such unlawful acts. On the contrary, the evidence shows that William Richilieu, who appears not only to have been an instigator, but an actual participant, in several assaults, was thereafter placed in charge of the pickets as captain.

In Eddy, Comb'ns, § 539, it is said:

"A picket is the agent of a combination. * * * In determining the object of the combination the courts will probe deeper than resolutions and mere professions of good will and lawful intentions. It unfortunately happens that there is seldom a case where a picket is maintained that the members of the picket or their hangers on do not resort to acts of violence, and to jeers, cries, epithets, and threats calculated and intended to intimidate workmen who are not members of the combination. So true is this that the very term 'picket' has come to mean in the popular mind threats, violence, and intimidation. It is conceivable, however, that a picket entirely lawful might be established about a factory, but such a picket would go no further than interviews and lawful persuasion and inducement. The slightest evidence of threats, violence, or intimidation of any character ought to be sufficient to convince court and jury of the unlawful character of the picket, since the picket, under the most favorable consideration, means an interference between employer seeking employés and men seeking employment."

From Allis Chalmers Co. v. Reliable Lodge (C. C.) 111 Fed. 267, we quote:

"Probably to some extent the acts of violence complained of have been done by persons not members of the union, and not connected in any manner with the striking workmen, but in some of the cases the evidence is so specific that it cannot be overlooked. It is true that at such times, when excitement runs high, the public mind is inflammable, at least among such persons as usually attach themselves to strikers. It is also true that the criminal classes take advantage of such occasions to commit, under cover of honest men, dastardly and cowardly acts. These facts, applied to this case, make it apparent that the conduct of defendants was calculated to work a serious wrong to complainant. In the judgment of the court, the pickets were in some cases themselves guilty of intimidating complainant's workmen, and were the indirect, if not the direct, inspiration of like acts and of violence by others. It is conceded that these pickets were appointed and directed by officers and members of defendant lodges. That a conspiracy existed among a number of these officers and members to stop, and thereby injure, the business of complainant, by intimidation and violence, is evident. In a conspiracy of this character, where it is difficult to even learn the names of the individual members of the lodges, the active co-operation of the individual members in the conspiracy is difficult to establish by direct proofs; but their acquiescence in, and connivance at, the methods pursued by their officers and leaders, is easily established by the results sought and accomplished."

The same question was presented to the court in Southern R. Co. v. Machinists' Local Union No. 14 (C. C.) 111 Fed. 49. It was said:

"There was no protest by this labor union when Williams was assaulted, beaten, locked in a box car, and shipped out of town on another railroad, nor when Ridge was assaulted and beaten. No steps were taken to expel from the union these violators of the law and of the personal liberty of the 'scabs' and their employers, nor to censure them, nor to discover them to the police. Absolutely nothing was done in this way to disown these acts, and now the only reliance is that the original minutes of the union counseled and directed there should be no violence. * * * Enough has been said to show that the court is of the opinion that the defendants are responsible for the assaults upon and the beating of Williams and Ridge, the ugly details of which need not be given. If we were trying the defendants upon indictments or as a police magistrate, possibly the proof would fall short of conviction, upon the ground of a reasonable doubt, though even that may be questionable. But, whether any of the named defendants made those assaults or not, they were made in their behalf and for their benefit, and in aid of their strike. That is sufficient. If the picketing, the climbing of the adjacent telephone poles, the climbing upon the fences, the watching of the shops, the assemblies in the streets and at the entrances, and the constant and unceasing surveillance, had been confined to obtaining information and to unobjectionable social intercourse, for the purpose of begging and entreating not to work, there could be no injunction. But the thrusting themselves upon unwilling 'scabs' to 'argue'; 'persuading,' picketing, climbing poles and fences, as an exhibition of force and threats, accompanied by such assaults as have been mentioned; violent, abusive, and threatening messages sent to 'scabs' inside, and the like, as shown in this proof,—come clearly within the decisions against such conduct."

In Farley v. Peebles, 50 Neb. 723, 733, 70 N. W. 231, 234, it is said:

"In short, we conceive the rules to be that a conspiracy may be established by circumstantial evidence, including overt acts in pursuance thereof by individual conspirators, the others not being present or participating in such acts."

In the light of these authorities, it seems clear that all of the respondents who were members of the various organizations which

established and maintained the picket line, as well as those who are shown by the evidence to have personally participated in the assaults and various acts of intimidation, must in this action be held chargeable with the results naturally flowing therefrom. I am fully convinced that the majority of the strikers in this case are upright, honorable men, worthy and well-disposed citizens, but they voluntarily put into operation a system of espionage which history shows is almost universally accompanied by intimidation, force, and violence. Can it be doubted for a moment that, had there been no strike and no picketing, there would have been no assaults, no threats, and no intimidation? It is not to be inferred from this that strikes and picketing are either necessarily wrong or harmful. As before stated, to strike and quit work when no contract obligation is violated is not unlawful. No person is required to perform labor except upon terms and upon conditions satisfactory to himself. On the other hand, any person has a right to labor unmolested upon terms and under conditions which are satisfactory to himself. When picketing interferes with this right to labor, it becomes unlawful. If picketing is only done to obtain information, to reason with and peacefully persuade a fellow being to cease his employment it is not unlawful; but when, as shown by the evidence in this case, it is extended to coercion by violence, threats, and intimidation, it is unlawful, and all parties who participate in the maintenance of the picket after it has become unlawful, and while it is so unlawfully conducted, cannot relieve themselves from civil liability by showing that at its inception it was intended to be conducted lawfully.

The notion seems to prevail among a large number of the laboring class that, if they quit work because of unsatisfactory conditions, those who take the places vacated are doing a wrong, an injustice, to the families and persons of those who quit. Whatever force there may be, if any, to this proposition from the ethical standpoint of the laborer, it has no legal support. If A., for the welfare of himself and family, leaves an employment, and B., seeking the welfare of himself and family, takes the place voluntarily vacated by A., no legal wrong has been done A. by B.; and the court, being no respecter of persons, will protect the rights of B. as fully as those of A.

Labor unions, when lawfully conducted to promote the welfare of the individual members, are not only commendable, but should be encouraged. It must, however, be remembered that every man has a right to decide his own course, and no body of men have a right to force their rules or their desires upon another against his wish. The union laborers on account of being in a majority have no more right to direct the action and conduct of the nonunion laborer than the nonunion, if in the majority, to dictate that of the members of the union. Combinations of labor and of capital are not inherently evil. Combination means association, and when conducted simply to advance the legitimate interests of those belonging to the combination it is difficult to perceive how evil can result therefrom, but when conducted in a manner to interfere with individual liberty or as a menace to the public peace and welfare they place themselves without the protecting shield of the law.

A decree will be entered for complainant as follows:

It is ordered, adjudged, and decreed that each and all of the respondents not dismissed as aforesaid, and any and all other persons associated with them in committing the acts and grievances complained of in said bill, be, and they are hereby, ordered and commanded to desist and refrain from in any manner interfering with the free use and occupation by complainant of any and all of its property or premises of every kind and character; and from entering upon the grounds or premises of complainant for the purpose of interfering with, hindering, or obstructing its business; and from compelling or inducing, or attempting to compel or induce, by threats, intimidation, force, or violence, any of the employés of complainant to refuse or fail to perform their duties as such employés; and from compelling or inducing, or attempting to compel or induce, by threats, intimidation, force, or violence, any of the employés of complainant to leave the service of complainant; and from preventing, or attempting to prevent, any person or persons, by threats, intimidation, force, or violence, from entering the service of complainant; or from preventing, by violence or in any manner of intimidation, any person or persons from going to or upon the premises of complainant for any lawful purpose whatever, or from aiding, assisting, or abetting any person or persons to commit any or either of the acts aforesaid; and the said respondents, each and all of them, are forbidden and restrained from congregating at or near the premises of complainant for the purpose of intimidating its employés or coercing said employés, or preventing them from rendering their service to said complainant; and from inducing, by intimidation, coercion, or threats, any employé to leave the employment of said complainant, or from attacking, assaulting, threatening, or by use of abusive language, or in any manner of intimidation, at any place within the city of Omaha, attempting to prevent any of the employés of complainant from continuing in its service, or any person or persons from engaging in the service of complainant; and each and all of them are enjoined and restrained from going, either singly or collectively, to the homes of complainant's employés, or any of them, for the purpose of intimidating or coercing any or all of them to leave the employment of complainant, or from entering complainant's employ, and as well from intimidating or threatening in any manner the wives and families of said employés for the purpose of preventing any employé from remaining in the service of complainant.

It is impossible, as well as impracticable, for the court in advance to specify all the acts and things which shall or may constitute intimidation or coercion. This must be left to the wisdom and intelligence of respondents. Any violation of the order will, however, be done at the party's peril.