## RIGHTS OF EMPLOYER AND EMPLOYEES DURING A STRIKE OR LOCKOUT.

Superior Court of Cincinnati.

THE FULWORTH GARMENT COMPANY V. THE INTERNATIONAL LADIES' GARMENT WORKERS UNION ET AL.

Decided, December, 1913.

*Strikes—Combinations of Workingmen and the Means They May Use in Enforcing Their Demands—Picketing, Persuasion, and the Maintaining of Patrols in Front of the Employer's Premises—Injunction Against Interference by Strikers—Parties to such a Proceeding.*

1. The right of workmen to combine for their mutual benefit, and to quit work individually or in a body, provided such action is unattended by violence, destruction of property, or other interference with the rights of employers, is well-established; but this right is reciprocal, so that the employer may likewise discharge any or all of his employees, and, under ordinary circumstances, the court will not inquire into the reason for his action.

2. The employer has a right to determine in what manner his work shall be done, and to determine what kind of work each employee shall be required to do; and the employee or the organization of which he may be a member is not permitted to stipulate to the employer what particular portion of work shall be done by any one employee.

3. In the event of a strike by the employees, or of a lockout by the employer, such means may be employed to render the strike or lockout effective as are not in themselves unlawful or inconsistent with the rights of others. The former employees may meet new employees, so long as the latter are willing to be approached, and discuss with them the questions involved, and persuade them, if possible, to leave their new employment, provided that in so doing they violate no property rights and induce no breaches of contract; but the use of force, violence or intimidation is under no circumstances permissible, however lawful the strike may be.

4. The stationing of "pickets" near the premises of the employer is permissible so long as it is done for the mere purpose of observing what is going on, and obtaining such information as strikers are entitled to, or for the purpose of endeavoring to persuade, by orderly and peaceful methods, those who are willing to listen; but the keeping of patrols in front of, or about the premises of

the employer, accompanied by disorder or violence, or any manner of coercion or intimidation, to prevent others from entering into or remaining in his service, or the approaching of those who do not desire to confer with them, is unlawful; and if the purpose is to procure workmen to break contracts of employment, it will not be lawful even though conducted in a peaceable manner.

5. A court of equity has no criminal jurisdiction, nor will it ordinarily interpose by injunction to prevent the commission of a crime. But where there is interference with property rights and where the continuance of such interference will result in irreparable damage or a multiplicity of suits, a court of equity will intervene by injunctive process, and its jurisdiction is not destroyed by the fact that if the threatened offenses were committed they would amount to violations of the criminal law.

6. An equitable action for an injunction is a proceeding *in personam*, and the court will not ordinarily enjoin those who are not made parties to the suit. This is particularly true where the names of all those whom plaintiff desires to reach are in its possession, and where they may be made parties by either a supplemental petition or a proper entry.

*Miller & Foster*, for plaintiff.
*Snyder & Dickerson*, contra.

OPPENHEIMER, J.

Plaintiff is a corporation organized under the laws of Ohio and engaged in the manufacture of ladies' garments at No. 411 Race street, in the city of Cincinnati. Plaintiff files its bill in equity alleging that the several voluntary organizations and the several individuals who are named as defendants, together with others whose names are unknown, have conspired to injure plaintiff's business, by threatening, intimidating and offering violence to plaintiff's employees, in order to compel them to quit plaintiff's service.

The testimony in the case is quite voluminous, the trial having extended over a period of six days. It appears from the evidence that plaintiff had conducted a so-called "union shop," employing various members of the several defendant organizations, and that from time to time disputes had arisen between plaintiff and these organizations concerning employees whose work was apparently unsatisfactory, or whom, for other rea-

sons, plaintiff did not desire to retain in its employment. These various disputes were ordinarily amicably adjusted between plaintiff and committees representing the several organizations.

Ultimately a dispute arose over one Philip Shinkelman, a garment worker who was a member of Local No. 98. Shinkelman had been employed by defendant for some time, and had been put to work upon sample garments which were being prepared by plaintiff for the use of its salesmen who were about to take the road for the purpose of selling the spring output of plaintiff's shops. Shinkelman's work upon these samples was, according to plaintiff's testimony, unsatisfactory, and plaintiff therefore insisted that he be put to work at the making of ordinary stock garments and that he discontinue his work upon either samples or duplicates. The local of which Shinkelman was a member refused, however, to permit this, and a resolution was passed at a meeting held on Wednesday evening, November 12th, 1913, requiring that Shinkelman be continued at work upon either samples or duplicates, and forbidding his employment by plaintiff in any other capacity. On the following day a meeting was held between the officers of the plaintiff company and Messrs. Nicholas Klein, attorney for the International Ladies' Garment Workers Union, and Harry Berkowitz, business agent of the several locals. This meeting might have resulted in the amicable settlement of the dispute had it not been for the actions of Berkowitz, who applied some rather unparliamentary epithets to the president of plaintiff company, as a result of which the meeting was unceremoniously adjourned.

On the following afternoon, plaintiff's employees were advised to take their tools with them, because there would be no further work for them unless the resolution theretofore passed was rescinded, so that Shinkelman might be employed upon stock garments. The employees did not, however, remove their tools, for they apparently expected an adjustment of the dispute.

On that evening at a meeting of the joint board, which consisted of five representatives from each of the four locals, the resolution passed by Shinkelman's local was disapproved, and another resolution was passed permitting the employment of

Shinkelman upon stock garments, in accordance with plaintiff's requirement. It was left to Berkowitz to communicate the latter resolution to plaintiff, and upon the following Monday Mr. Klein informed plaintiff that at noon on Tuesday a conference would be held at plaintiff's place of business. On Tuesday morning, however, before this conference was to have taken place, Berkowitz gave orders to the Roberts Sign Company for the making of a banner bearing the following inscription: *"Fulworth Garment Company have locked out their employees. Lady garment workers stay away"*; and about noon, when the conference was to have been held, this banner was placed upon the street in front of plaintiff's business and Berkowitz failed to appear for the conference.

Plaintiff immediately made arrangements to secure non-union help, and employed a number of men and women who were not members of any of the locals. Immediately the former union employees of plaintiff and numerous sympathizers, practically all of whom were members of the local branches of the International Union, began to do picket duty upon the sidewalk in front of the entrance to plaintiff's building, and endeavored by persuasion and threats to induce these employees to leave plaintiff's service and join forces with them. In many instances where they were unable to reach the employees as they left plaintiff's premises, they followed them to their places of residence, or sent committees to wait upon them, and offered them various sums of money to quit plaintiff's employment, and in several instances threatened them with bodily harm unless they acceded to these demands. Police were stationed at the place to preserve order, and guards were employed by plaintiff to protect its property and its employees, with the result that frequent encounters took place between the police and the pickets, the street and sidewalk were frequently filled with disorderly gatherings, and pedestrians were prevented from passing plaintiff's place of business. Various (employees of plaintiff were attacked by the strikers and their sympathizers, and in several instances serious injury was inflicted upon them.

Plaintiff now seeks to enjoin the carrying of the banner, the placing of pickets in front of its place of business, the intimida-

tion of employees, and all other acts which interfere with the carrying on of its business in the usual manner.

As for the banner to which reference has been made, defendants have voluntarily withdrawn this from before plaintiff's place of business, so that we need not further consider the propriety of displaying it. We must, therefore, direct our attention to the power which courts of equity have in a case such as this to restrain the other acts of which plaintiff complains.

We believe that certain principles, applicable to such cases as the one before us, have been well established by a long line of decisions, concurrent almost with the existence of labor unions, and it may be well for us first to enumerate some of these principles as guides in the consideration of the questions presented for our determination.

(1). The right of workmen to combine for the purpose of raising their wages, elevating their social condition, and otherwise benefitting themselves, is undeniable. It is true that the early English cases denied the right of workmen to combine for such purposes. Numerous statutes were passed, beginning with the "Statute of Labourers," enacted in 1349-1350, for the express purpose of preventing such combinations and checking the rise in wages. A combination of two or more persons for the purpose of enforcing their demands for higher wages was deemed a criminal conspiracy and was made punishable as such. All these early English statutes prohibiting such combinations were repealed by the Act of 6 Geo. IV, c. 129 (1825), and the statutory prohibitions were confined to endeavors by force, threats, intimidation, molestation, or obstruction to affect wages or hours.

In America the early English rule has been unrecognized, except in several early decisions in New York and Pennsylvania which have long since been repudiated, and it is now well settled that workmen may combine and associate themselves together for the purpose of bettering their financial or social condition by legitimate and fair means.

(2). Unless restrained by contractual relations, workmen may, for the purpose of gaining legitimate advantages, either economic or social, agree to, and quit work in a body, provided such action is unattended by violence, destruction of property,

or other interference with the rights of employers. To require an individual, or a group of individuals to work for one in whose employment they do not desire to remain would be tantamount to the restoration of slavery or serfdom. There can, therefore, be no doubt that one who is in the employ of another under a contract terminable at will, has a right to discontinue his service at any time, however capricious his motives may be. And when the individuals have combined for the purpose of concerted action, the combination of workmen have the same right as the individual, so long as they have no unlawful object in view, and are not actuated by a malicious intention to injure an individual or the public without just cause. The employees who are members of such organization have a right to refuse to work with non-members, so long as they do not interfere with the property rights of the employer. *National Protective Association* v. *Cumming,* 170 N. Y., 315; *Waddy* v. *Typographical Union,* 105 Va., 188; *Printing Co.* v. *Cassidy,* 63 N. J. Eq., 759.

(3). The rights just enumerated are reciprocal, so that the employer may discharge any or all of his employees whose contracts of employment are terminable at will, and the court will not inquire into the reasons for his action.

(4). The employer has the right to determine in what manner his work shall be done, without interference by others, and has the right to employ such men as he sees fit and, as a condition of such employment, to determine the kind of work which each employee shall be required to do. If the employee does not desire to do such work as may be assigned to him, he may terminate his employment; but neither he nor any one else may stipulate to the employer that an employee shall be permitted to do such work as he chooses, regardless of the employer's wishes.

(5). If employees terminate the relationship between themselves and their employer, as a result of either a strike or a lockout, they can no longer be said to be employees. The positions which they formerly occupied are vacated, and if they again enter into the service of the employer, it must be as the result of a new agreement. It follows that those who are employed subsequently to take the places vacated by them can not

be said to occupy any positions to which the former employees are legally entitled, and can not be interfered with by them in their occupancy of such positions. .

(6).  The employer can not be compelled to take any of the former employees back into his service, nor can the employees be required again to enter into the service of the employer.  By exercising their right to terminate their relationship they have mutually surrendered their rights to require the other to resume the relationship.

(7).  The employer has a right to secure the services of others, either under agreement for definite periods of service, or under agreement terminable at will, to take places formerly occupied by those who struck or are barred by a lockout; and the latter need not be consulted concerning, and have no right to object to, such employment.

(8).  The former employees have a right to use such means to render a strike effective as are not in themselves unlawful or inconsistent with the rights of others.  To that end they may support their contest by argument, persuasion, or entreaty, even if the result of the use of such means is ultimately to succeed in persuading all available laborers to support the strike, and thus to secure a monopoly of the labor market.  They have the right to meet the new employees, so long as the latter are willing to be approached, and to discuss with them the questions involved, and to persuade them, if they can, to leave their new employment, provided that in so doing they violate no property rights and induce no breaches of contract.

(9).  The use of force, violence, or intimidation to attain the ends of the strikers is under no circumstances permissible, however lawful the strike may be, and it is immaterial that the workmen who have replaced the strikers are not bound by contract to enter into or continue in the employer's service. The new employees have the right to come and go when and as they please, without fear of molestation, and to work for whom they please and for such sums as they think proper, without being compelled to discuss these or other questions and without being terrorized or intimidated.  The right heretofore mentioned to quit employment at will connotes the right to

retain employment at will, and any interference with the latter right is necessarily an invasion of the privilege for which the striking workman is himself contending.

(10). The stationing of persons near the premises of the employer, commonly known as "picketing," is permissible so long as it is done for the mere purpose of observing what is going on and obtaining such information as a striking workman may be entitled to, or for the purpose of endeavoring to persuade, by orderly and peaceful methods, those who are willing to listen; but the keeping of patrols in front of, or about the premises of the employer, accompanied by disorder or violence, or any manner of coercion to prevent others from entering into or remaining in his service, or the approaching of those who do not desire to confer with them, is unlawful. The streets are for public use; and as he is one of the public, the new employee has the right to go back and forth freely, without being harassed by arguments, and without being subjected to force, threats, intimidation or insulting language. Picketing need not be accompanied by force to be unlawful. If it be conducted merely with the design to hinder or obstruct the new employees or others, or to convey the idea that compliance with the strikers' request will be advisable, or if it be calculated to intimidate the weak and fearful, it as as much unlawful as though it were accompanied by physical force. And so if the purpose of maintaining a picket is to procure workmen to break contracts of employment, it will be unlawful even though conducted in a peaceable manner.

We may now proceed to examine the evidence, and ascertain whether or not any of the preceding principles have been violated.

Counsel for defendants first of all contend that inasmuch as the evidence indicates that the police force of the city is competent to deal with the situation, and that various alleged lawbreakers have been arrested and brought before the proper tribunal, this court has no jurisdiction in the case because of the rule that equity will not enjoin the commission of an offense. We fear that this is a *non sequitur*. The mere fact that an unlawful act may be accompanied by a breach of the criminal law

and thus render the offender amenable to its penalties, does not necessarily deprive a court of equity of jurisdiction. It is true that there must be something more than a mere threat to commit an offense against the criminal law to induce a court of equity to intervene. It is true also that even though there be an actual breach of the criminal law, or numerous such offenses, a court of equity has no criminal jurisdiction. But when there is an interference, either actual or potential, with property rights, and where the continuance of such interference will result in irreparable damage or a multiplicity of suits, a court of equity will intervene, and its jurisdiction is not destroyed by the fact that the offenses are violations of the criminal law. The existence of the right to exercise force for the purpose of terminating the unlawful acts is not inconsistent with the right to appeal to the Courts for a judicial determination of the matters in dispute. The complaint against this assumption of equitable power comes from no one except those who are inclined to violate the law. *In re Debs,* 158 U. S., 564, 593; *Union Pacific Railway Co.* v. *Ruef,* 120 Fed., 102, 108, 109, 125.

It is further argued by Counsel for the defendants that the number of pickets before plaintiff's place of business was never "in excess of the number necessary to perform the service required of them in picketing the place of business of their former employer," and as the testimony of those responsible for their actions indicated that they invariably counselled peace and gentlemanly conduct, they can not be held responsible for any violence or disorder.

This argument also appears to us to be absolutely illogical. We have already indicated that picketing, in and of itself, when properly conducted, is not unlawful; but if it is conducted in an improper manner or attended with violence or disorder, or if its inevitable effect is to interfere with the rights of others, it is absolutely unlawful; and the number of those involved or the advice given them by others can in no wise affect the case. The testimony indicated that there were various scenes of disorder, and that on one occasion twenty-two persons were arrested at about 5.30 P. M., in front of plaintiff's place of business and that twenty of these were pickets. On

another occasion a struggle arose at the same place, in which no less than sixteen pickets were implicated and "black jacks," "brass knucks" and an ammonia gun were displayed. It surely can not be contended that the presence of sixteen or twenty pickets on a sidewalk less than ten feet in width, and in front of an entrance to a building which does not exceed six feet in width can possibly be necessary, particularly in view of the fact that only twelve people were then working for plaintiff. Race street is one of the busiest retail thoroughfares in this city, and that portion of the street in the neighborhood of plaintiff's shop, particularly during the holiday season, is traversed by thousands of people each day. The presence of numerous pickets, therefore, must of necessity impede traffic and interfere with the rights of others to pass without annoyance; and when the presence of a large number of pickets is invariably attended with disorder or violence, the court's duty must be manifest. Indeed the number of pickets is immaterial; for if their purpose is unlawful, picketing is illegal whether there be one or many (*Eddy on Combinations*, Section 539). It is not the obstruction of the highway with which the court is concerned so much as the offenses which have attended upon the gathering of pickets in this case. Although it may be true that those in authority advised the pickets against resorting to violence, yet there is no evidence of any action on the part of any individual or organization looking toward the disciplining or punishing of those who disregarded this advice. Immunity can not be secured by merely showing that the officers of the several organization advised their members to conform with the law.

In this connection we desire to call attention to the testimony concerning the employment of Mrs. Artie Belle Martz by Berkowitz, the business agent of the several locals, to act as his personal representative in connection with this strike or lockout. She secured employment in plaintiff's shop ostensibly as a non-union tailoress but in reality she was a member of the union and was acting admittedly (and we now use a word authorized by Berwkowitz himself) as a "spy." Berkowitz testified that her duty was to procure information concerning the place of residence of the various employees, so that efforts

might be made to see them at their homes and induce them to
withdraw from plaintiff's service. In three instances she ad-
mittedly made appointments with employees; and it seems to
be more than a mere coincidence that in each case the employee
with whom she made the appointment was subsequently attacked
and subjected to violence. One of these was a woman, Mary
Shearer, and she was injured so that the attendance of a physi-
cian was necessitated. The other two employees, Caplan and
Topper, were also badly beaten. It may also be remarked in pass-
ing that the pretense upon which she met these employees was
different in each case. It must be said in justice to the locals and
to their members, that this woman was employed by Berkowitz
without their knowledge or consent, and that when the fact of her
employment was brought to their attention, they condemned
his action and refused to sanction the payment for her services.
Surely counsel for defendants can not seriously contend that
the attacks upon these employees were entirely unconnected
with the fact of their employment, or with the fact that a strike
was in progress. The visit of a numerous committee to the
house of Morris Harris in his absence for the purpose of inform-
ing his wife that unless he terminated his employment forth-
with he might suffer permanent injury, and the visit of a com-
mittee to the residence of Louis Brown, and the subsequent
threat to hide that committee in the attic of his residence for the
purpose of attacking him, and the attack upon the president of
the plaintiff company by three of the union men and members
of their families at the Grand Central Station to which he had
gone to meet a relative who was to arrive in the city, must
likewise be viewed as illegal attempts to carry out the purposes
of defendants.

It is further suggested that the Court has no right to in-
terfere because there is no evidence that defendants entered
upon plaintiff's property. This suggestion arises out of a mis-
conception of the property rights which courts of equity may
protect.

"A person's business is his property and he is entitled to
protection from unlawful interference therewith. Every person
has a right to carry on his legal business according to his own

discretion, and to employ therein any means which are safe, healthful and lawful, and to employ such persons as he may select; and it is the duty of all other persons to refrain from obstructing any party in the exercise of these rights.'' *1 Eddy on Combinations,* Section 542. See also *Mulholland* v. *Waiters' Union,* 13 O. D. (N. P.), 342, 359.

A person may also be said to have a property right in his contracts, and is entitled to protection against any unlawful interference with these contracts, particularly where the remedy at law would be inadequate. In the case at bar, the testimony indicates that that plaintiff was compelled to enter into contracts with various new employees in order to secure their services, which contracts are to run from three months to one year. It is generally held, as heretofore indicated, that an attempt to procure a breach of contract of employment is unlawful, whether the attempt made by an individual or a combination of individuals, and a court of equity will enjoin such interference; and it is no justification that defendants acted in good faith, in the pursuance of their general purpose to promote their own welfare, and without knowledge of the existence of the agreement. Defendant Berkowitz admits that he authorized his representatives to offer various sums of money to various employees to induce them to quit their employment, and this and the other actions complained of, in so far as they affect contractual rights, are undoubtedly improper. Martin on Labor Unions, Sec. 209.

It is apparent from the foregoing considerations that plaintiff is entitled to an injunction restraining defendants from those acts, which, as has heretofore been indicated, are unlawful and are a proper subject for equity jurisdiction. We come now to consider the extent of such injunction as to the parties involved. Counsel for plaintiff has directed our attention to numerous cases which hold that the entire membership of the various locals may be enjoined through defendants as their representatives, particularly through Berkowitz, who was their agent in all that he did. Counsel further contends that the injunction may issue against an unincorporated labor union, and thus all the individual members may also be reached. Special reliance is placed upon the case of *Hillenbrand* v. *Building Trades Coun-*

*cil,* 14 O. D. (N. P.), 628, which was decided in this Court in February, 1904.   We regret to say that we find ourselves differing from the learned judge who decided that case, not so much as to the law which is therein expressed, as with the practical results which must necessarily follow the rule which he adopted. An action for an injunction is a proceeding *in personam,* and we do not believe that the court has the moral right to lay its restraining hand upon one who may never have heard of the controversy which is before the court, who may never have participated in the acts which are the object of its animadversion, and who has had no opportunity to defend himself against the imputation which would thus be made to rest upon him.   In short, we are unalterably opposed to the theory of "blanket injunctions," particularly where such course is, as in this case, unnecessary.   Plaintiff has in its possession, and has carried into the record, a list of all the members of the several locals, and it will be entirely possible for it to make any or all of them parties to this proceeding.   While it is true that at the time when the petition was filed, most of the members of these Locals were unknown to plaintiff, the information has since been furnished to plaintiff, and our ruling will therefore work no hardship upon it.   It is true that many of the members of the locals were present during the trial of the case, and when, after argument, the court expressed its view substantially as herein set forth.   (Indeed, the evidence would indicate that various members of the locals and various sympathizers who were not members, were instructed by Berkowitz to give up their work during the trial of this case and to appear at the court each day, for a purpose which was entirely too  apparent to escape our notice.)   Of course, these men and women who are aware of the injunction will necessarily be controlled thereby, and they will not violate the writ except at their peril, but the injunction will actually issue only as to those who are made parties defendant and plaintiff will have leave at any time before the final hearing by proper entry to make such other parties defendants as it may see fit.

We might suggest before closing, that had it not been for the actions of Berkowitz, this defficulty would never have arisen,

and the court would never have been asked to interfere. The evidence clearly indicates that every controversy between the employer and its employees was ultimately satisfactorily adjusted by the local which was involved. Even in this case the joint board, by its action in overruling the resolution of Local No. 98, complied with the demands of plaintiff, so that there was absolutely no necessity for either a strike or a lockout. Had the result of this action been communicated to plaintiff, the controversy would have ended at that point; but such simple action would not, apparently, have served the purpose of Berkowitz, so that he, whose duty it was to communicate the information, failed to do so, called the strike and stationed the pickets at plaintiff's place of business. We believe that a decree enproper and unlawful will practically terminate the controversy, joining Berkowitz from the doing of those things which are imfor all parties except himself are in a conciliatory frame of mind.

A decree will therefore be entered for complainant as follows:

It is ordered, adjudged and decreed that each of the defendants be, and they are hereby ordered, and commanded to desist and refrain from collecting and attempting to collect in crowds in the street or upon the sidewalk at or near plaintiff's premises located at Nos. 411-413 Race street, in Cincinnati, Ohio, and from entering or attempting to enter plaintiff's said premises for the purpose of interfering with the free use and occupation by the plaintiff of any and all of its property or premises of any kind and character; from compelling or inducing or attempting to compel or induce, by threats, intimidation, force and violence, any of the employees of plaintiff to refuse or fail to perform their duties as such employees; from compelling or inducing, or attempting to compel or induce, by threats, intimidation, force or violence, any of the employees of plaintiff to leave its service; from preventing or attempting to prevent, any person or persons, by threats, intimidation, force or violence, from entering the service of plaintiff; from preventing, by violence or any manner of intimidation, any person or persons from going to or upon the premises of complainant for any lawful purpose whatever, or from aiding, assisting, abetting or counselling any person or persons to commit any or either of the acts aforesaid; from attacking, assaulting, threatening, intimidating, or using abusive language toward any of the employees of plaintiff at any place within the City of Cincinnati; from going either

singly or collectively, to the homes of complainant's employees, or any of them, for the purpose of intimidating or coercing any or all of them to leave the employment of the plaintiff, or from entering plaintiff's employ, as well as from intimidating or threatening in any manner the wives and families of said employees for the purpose of preventing such employees from remaining in the service of plaintiff; from doing any act whatever in furtherance of any purpose to restrain plaintiff or its employees in the free and unhindered control of its business; from inducing or endeavoring to induce by threats, intimidation, or any other method, anyone to violate any contract with plaintiff, and from counselling, advising, aiding or abetting any or either of the acts aforesaid.

In conclusion we quote the language of the Circuit Court of the United States in the case of *Union Pacific Railway Company* v. *Ruef, supra*:

"It is impossible, as well as impracticable, for the court in addition to specify all the acts and things which shall or may constitute intimidation or coercion. This must be left to the wisdom and intelligence of respondents. Any violation of the order will, however, be done at the party's peril."